## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Ricky R. Schuh, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Doug Burgum, Governor of North Dakota; | ) | |
| Dave Krabbenhoft, Director of DOCR; | ) | |
| Colby Braun, Director of Facility | ) | |
| Operations; James Sayler, Ex-Warden; | ) | |
| Joseph Joyce, Warden; Lance Anderson, | ) | |
| Warden of Transitional Housing; Shawn | ) | |
| Fode, Deputy Warden; Steven Foster, | ) | Case No. 1:24-cv-1 |
| Deputy Warden; Rick Hochhalter, | ) | |
| Classification; Joe Chavat, Chief of | ) | **REPORT AND RECOMMENDATION** |
| Security; Molly Goebel, Lead Legal Counsel | ) | **AND ORDER** |
| for NDSP; Stacie Peterson, Director of | ) | |
| Treatment; Heather Davis, Director of | ) | |
| Preferred Housing; Lacie Zander, Unit | ) | |
| Manager; Lacy Fischer, Hearings Officer; | ) | |
| Steven Bement, Case Manager; Levi Ryan, | ) | |
| Case Manager; Alex Collins, Case Manager; | ) | |
| Justin Helgeson, Captain; Mike Bryant, | ) | |
| Sargent; Dana Michaelson, Edu. | ) | |
| Instructor; Clinique Chapman, Senior | ) | |
| Associate; and John Pineda, Deputy | ) | |
| Director, all in their official and individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Ricky R. Schuh, proceeding in forma pauperis (IFP) and pro se, submitted for

filing a proposed complaint while he was an inmate at the North Dakota State

Penitentiary (NDSP). (Doc. 10). Under 28 U.S.C. § 1915A, the court must conduct an

initial screening of any prisoner's complaint that seeks redress from a governmental

entity or its employees.[1] If the court determines the action is frivolous, malicious, fails to state a claim, or seeks monetary relief against a defendant immune from such relief, the court must dismiss the complaint before it is served on the defendants.

Schuh moves for service of the complaint and summonses on the named defendants. (Doc. 26). And he objected to an earlier order of this court that denied his motion to change venue. (Doc. 18). In addition to the initial screening of Schuh's complaint, this report and recommendation and order addresses Schuh's motion for service and his objection to the order denying his motion to change venue, which the court reviews as a motion for reconsideration of that order.

## Background

Schuh's complaint, generally brought under 42 U.S.C. § 1983, includes 20 claims—against 23 defendants—arising from his incarceration at NDSP.[2] Broadly stated, since May 2022, Schuh alleges Eighth Amendment violations, First Amendment retaliation, due process violations, denial of equal protection of the law, discrimination and retaliation under the Americans with Disabilities Act (ADA) and the Rehabilitation Act, violations of Title VI and VII of the Civil Rights Act of 1964, willful misconduct

---

[1] Schuh filed the complaint while incarcerated at the NDSP. On March 7, 2024, Schuh updated his address with the Clerk, advising he was living at Centre, Inc., in Mandan, North Dakota. Screening of the complaint under § 1915A is still required because Schuh was a prisoner when he filed the complaint. See Jaros v. Ill. Dep't of Corr., 684 F.3d 667, 669 (7th Cir. 2012); Cole v. Cotton, No. 4:21CV3062, 2021 WL 2187146, at *1 (D. Neb. May 28, 2021); Hayes v. U.S. Dep't of Just., Civ. No. 11-462, 2011 WL 2938100, at *2 (D. Minn. June 15, 2011).

[2] This is Schuh's second such suit. Schuh previously sued numerous NDSP employees under 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs, among other claims. See Schuh v. Burgum, No. 1:22-cv-26, Doc. 12 (D.N.D Mar. 17, 2022).

under the Public Readiness and Emergency Preparedness (PREP) Act (42 U.S.C. § 247d-6d(c)), and claims under 42 U.S.C. §§ 1981 and 1985. (Doc. 10, pp. 11-12). All defendants are sued in their official and individual capacities.

Schuh structures the complaint into four "claims," each containing several causes of action based on separately alleged facts. Id. The court uses Schuh's structure to organize the factual background but, instead of identifying sections as claims, refers to the divisions as "parts." To set the stage, the court first describes Schuh's prior lawsuit, which gives background for some of his current contentions.

In March 2022, Schuh sued many of the same defendants named in this case. See Schuh v. Burgum, No. 1:22-cv-26, Doc. 12 (D.N.D. Mar. 17, 2022).[3] There, Schuh asserted the defendants denied him treatment for a mental health condition (generalized anxiety) and delayed medical treatment for a hernia. See id. at Doc. 20. Schuh's prior suit allegedly prompted defendants to act, and he had hernia repair surgery in April 2022 and began mental health treatment in July 2022. (Doc. 10, p. 14). In July 2022, the parties voluntarily dismissed Schuh's prior suit, as approved by the district judge on September 7, 2022. Schuh, No. 1:22-cv-26, Doc. 43; Docs. 45-47.

## 1.    Factual Basis for Claims in Part 1

Schuh's allegations begin with a write-up he received on May 7, 2022, from Sergeant Mike Bryant for loitering in a day room and a June 15, 2022 write-up for

---

[3] Defendants in common between the prior and current cases include Governor Burgum, Dave Krabbenhoft, Colby Braun, James Sayler, Shawn Fode, Steven Foster, Stacie Peterson, Lacy Fischer, Lacie Zander, Heather Davis, Rick Hochhalter, Joseph Joyce, and Molly Goebel. (Doc. 10, p. 13).

threatening Sgt. Bryant.[4] (Doc. 10, p. 14). Case Manager Steven Bement held a hearing on the write-ups in June 2022. Id. During the hearing, Schuh denied threatening Sgt. Bryant and claimed the sergeant had targeted him. Id.

According to Schuh, Sgt. Bryant targeted him because Schuh reported a transgender inmate had been prostituting himself on Sgt. Bryant's shifts. Id. Schuh claims to have submitted a written report detailing this information to the treatment department. Schuh later learned that Stacie Peterson, the NDSP Director of Treatment, and Joseph Chavat, the NDSP Chief of Security, investigated the allegations but took no action because no cameras were in the area to confirm the alleged activity. Id. Schuh states he explained this background to C.M. Bement at his disciplinary hearing and argued that Sgt. Bryant retaliated against him for reporting the alleged prostitution. Id. at 14.

A separate event led to the June 15 write-up. Id. Schuh alleges that on June 5, 2022, Governor Doug Burgum and executives from the Vera Institute of Justice and MILPA Connective, two non-profit organizations, toured NDSP as part of an event marking the one-year anniversary of the Restoring Promise program.[5] Id. Schuh claims

---

[4] Schuh refers to the June 15 write-up as a "229, 230 report." According to the North Dakota Department of Corrections and Rehabilitation Facility Handbook, available online, Level II Infractions include 229 for disorderly conduct, which "means any minor infraction, including nuisance, breach of the peace, offensive or immoral conduct, or arguments or altercations with other inmates, visitors, or an employee, officer, or official of the ND DOCR," and 230 for disobeying a verbal or written order from staff, which "means failure to comply with a lawful command from an employee, officer, or official of the ND DOCR." North Dakota Department of Corrections and Rehabilitation, https://www.docr.nd.gov/ (follow "Family & Friend" hyperlink; then "Facility Handbook" hyperlink) (last visited Apr. 29, 2024).

[5] "Restoring Promise, an initiative led by MILPA and the Vera Institute of Justice, creates housing units grounded in dignity for young adults in prison." Restoring Promise, https://restoringpromise.vera.org/ (last visited Apr. 29, 2024).

NDSP's entire administration team was present for the event. According to Schuh, Nurse Stephanie Waldoch[6] later told him some people in the group tested positive for COVID before the tour.[7] Id. at 15. Schuh claims the tour went forward as scheduled despite the test results because executives from the two organizations had flown in for the occasion. Schuh alleges NDSP's administration knew allowing the tour to proceed would lead to a COVID breakout. According to Schuh, a major COVID breakout did in fact occur, which led to modified lockdowns beginning on June 10, 2022, and COVID testing of inmates on June 14, 2022. Id. Schuh was among the inmates who tested positive.

Early on June 15, Sgt. Bryant came to Schuh's cell and told him to pack his things because he would be moving to "overflow" for fourteen days, presumably a COVID quarantine period. Id. Schuh objected to moving because he had already had COVID and did not want to be further exposed to the virus by being housed with other inmates who had tested positive. Sgt. Bryant reportedly told Schuh, "You will do as you are instructed[,] or you will go to the hole."[8] Id. Schuh states he maintained his objection and told Sgt. Bryant it was unlawful to make him do something harmful. Sgt. Bryant asked if Schuh was refusing an order, and Schuh told  Sgt. Bryant that he was "acting like a little B* right now." Id. Sgt. Bryant called for support, and Captain Justin Helgeson responded to Schuh's cell at about 6:00 a.m.

---

[6] Nurse Waldoch is not named as a defendant.

[7] Schuh does not identify those persons who allegedly tested positive.

[8] The court recognizes the "hole" as a reference to administrative segregation.

Schuh alleges he explained his concerns about going to the COVID dorm to Capt. Helgeson. Id. The captain assured Schuh the probability of re-infection was low and encouraged Schuh to go to the dorm to avoid going to the hole. Schuh states he agreed to do as Capt. Helgeson suggested. Id. Schuh explains that after Capt. Helgeson left, he was served breakfast, packed his bag, and waited to be taken to the COVID dorm. Id. at 16. Other inmates began the move at 8:00 a.m., but no one came for Schuh. At about 9:00 a.m., Schuh alleges C.M. Bement arrived with five other officers and told Schuh to "cuff-up." Id. Schuh asked why, and C.M. Bement responded, "I think you know." Id. Schuh was put in the hole for ten days and received 229 and 230 infractions for threatening Sgt. Bryant. Id. at 14, 16.

During the June 2022 disciplinary hearing, Schuh claimed Sgt. Bryant lied on the 229 and 230 infractions report and waited until the next shift came on duty to send Schuh to the hole. Id. at 16. Schuh alleges he was denied the opportunity to call witnesses, provide evidence, or confront Sgt. Bryant during the hearing process. He claims that was because it was a level II, rather than level III< disciplinary report.[9] Id. C.M. Bement found Schuh guilty, and as a result, Schuh claims his custody level was

---

[9] The NDSP employs varying disciplinary procedures depending on the grade or level of infraction.

increased from a minimum to a medium level and as a result, he lost his housing and his job.[10] Schuh claims he also lost the opportunity for work release at the MRCC.[11] Id.

Schuh contends the NDSP "weaponized the disciplinary report" in retaliation for Schuh's report of prostitution in the facility. Id. He claims "they" knowingly infected him with COVID, attempted to force him into a situation that put him at further risk, lied to him, and punished him for raising genuine medical concerns. Id.

Schuh asserts a violation of the Eighth Amendment resulted in him suffering from long COVID. Id. at 17. He claims First Amendment retaliation because he reported prostitution within the NDSP. He also alleges a denial of due process at the disciplinary hearing. Those claims are asserted against defendants James Sayler, former Warden of NDSP, Dave Krabbenhoft, Director of the North Dakota Department of Corrections and Rehabilitation (DOCR), C.M. Bement, Sgt. Bryant, Chief Chavat, and Capt. Helgeson. Id. In addition, Schuh claims his right to safety was violated by Clinique Chapman (Vera Institute), John Pineda (MILPA Connective), and Gov. Burgum when individuals toured the prison while infected with COVID and asserts a willful misconduct claim under the PREP Act, 42 U.S.C. § 247d-6d(c). Id.

---

[10] The North Dakota Department of Corrections and Rehabilitation assigns each inmate a custody level, which impacts programming, housing assignments, and work assignments. Custody levels are routinely reviewed and may be increased or decreased based on a variety of factors, including disciplinary actions. North Dakota Department of Corrections and Rehabilitation, https://www.docr.nd.gov/ (follow "Family & Friend" hyperlink; then "Facility Handbook" hyperlink) (last visited Apr. 29, 2024).

[11] The court recognizes MRCC as a reference to the Missouri River Correctional Center, a facility within the North Dakota Department of Corrections. See North Dakota Department of Corrections and Rehabilitation, https://www.docr.nd.gov/adult-facilities/missouri-river-correctional-center (last visited Apr. 29, 2024).

Finally, and somewhat confusingly, Schuh indicates he is suing the following defendants in their official and individual capacities for the claims asserted in the first part of his complaint: Gov. Burgum, Dir. Krabbenhoft, C.M. Bement, Sgt. Bryant, Capt. Helgeson, Chief Chavat, Hearing Officer Lacy Fischer, Lacie Zander, Rick Hochhalter, Colby Braun, Shawn Fode, Steven Foster, Heather Davis, Chapman, Pineda, and Sayler. Id.

## 2.    Factual Basis for Claims in Part 2

Schuh's second set of claims arises from an alleged assault against him by a maximum custody level inmate, Johnathon Larson, on September 24, 2022. Id. at 18. Schuh states he received a 209 infraction report for fighting because he defended himself against the assault.[12] Schuh asserts that if he had not received the prior 229 and 230 infractions, he would have been classified at a minimum custody level and would not have been exposed to inmate Larson. Schuh also alleges that because he was classified at medium custody level, he should have been housed with inmates having similar custody levels. Id.

Schuh asserts the State knowingly failed to keep him safe by improperly housing him and deliberately refusing him opportunities that other inmates had. Id. Schuh claims an Eighth Amendment violation for cruel and unusual punishment, a denial of equal protection under the Fourteenth Amendment, and retaliation. Id. at 11. Schuh brings those claims  against Case Manager Alex Collins, C.M. Bement, Sgt. Bryant, Capt. Helgeson, Hochhalter, Sayler, and Dir. Krabbenhoft. Id.

---

[12] The DOCR Facility Handbook confirms a level II infraction under 209 refers to fighting.

3.      **Factual Basis for Claims in Part 3**

Schuh's next claims arise out of a write-up he received from Dana Michaelson for failure to program. Id. at 19. Schuh alleges he began a computer coding class, known as the Last Mile, in or about April 2022. Id. Schuh states he began to struggle with the class at about week nine and informed Michaelson of his problems. Schuh reportedly told Michaelson that his disabilities impeded his ability to understand, and he asked to be allowed to work in the kitchen instead of continuing with the class.[13] Michaelson informed him he could transfer but also encouraged Schuh to continue with the computer coding class. Id.

Schuh decided to continue with the class yet still struggled to understand the course material. To finish the class, Schuh needed to complete a capstone project, and Schuh did not believe he could do that. Id. Schuh states he again approached Michaelson and asked to transfer to the kitchen.[14] This time, however, Michaelson allegedly refused to transfer him and told Schuh he was under contract and was required to finish the capstone project. Id. Schuh states he tried his best but failed the course because he could not master Java Script. Id. Schuh alleges Michaelson was aware he did not understand that program.

After he failed the course, Michaelson informed C.M. Collins that Schuh was required to resubmit the capstone project and receive a passing grade. Id. If Schuh failed to do so, Michaelson reportedly said Schuh would receive a level III infraction for failing

---

[13] Schuh was diagnosed with generalized anxiety disorder by Kevin Shirado, a psychiatrist within the NDSP. (Doc. 10, p. 20; Doc. 10-3, p. 3; Doc. 11).

[14] Schuh does not allege he asked Michaelson for any accommodations to assist him in finishing the capstone project.

to program. C.M. Collins informed Schuh he had to either pass the course or face a write-up. Id. at 19-20. Schuh allegedly informed C.M. Collins his disabilities prevented him from finishing the program and requested a job transfer. Id. Schuh apparently did not resubmit his project and received a write-up on November 7, 2022.[15] Id. at 20. The write-up stated Schuh "feels . . . he does not need to participate in class and is refusing to submit his Project." Id. Schuh disputed the allegation.

A hearing on the failure to program write-up was held with C.M. Bement and Hearing Officer Fischer. Id. Schuh asserts he argued an accommodation was appropriate because of his generalized anxiety disorder and also claimed to suffer from post-traumatic stress disorder and possibly autism. Id. The write-up was found to have merit, but the infraction was reduced from level III to level II. Schuh alleges he lost his job as a sanction for the infraction. Id. at 21. C.M. Collins allegedly informed Schuh that a level II infraction would not affect his eligibility for parole or work release. Id. Based on C.M. Collin's representation, Schuh claims he agreed to the sanction even though he denied any wrongdoing. Schuh alleges the NDSP "chose to victimize" him for his disabilities and treated him differently than other inmates who did not have disabilities and were allowed to transfer without being punished. Id. He claims the NDSP lied to him about not using the write-up against him for parole or work release but then did so.[16] Id.; see also Doc. 10-5, p. 2 (referring to Schuh's disciplinary history during his incarceration as a concern for work release placement).

---

[15] Schuh states it was a level III infraction, the highest level.

[16] On July 25, 2023, Karla Marsh, NDSP Director of Classification, informed Schuh that no "points" were assessed against him for failing to program. (Doc. 22, p. 2).

Schuh claims discrimination, failure to accommodate, and retaliation under the ADA (42 U.S.C. § 12112) and Rehabilitation Act (29 U.S.C. § 794) and asserts violations of 42 U.S.C. § 1981, Title VI and Title VII of the Civil Rights Act of 1964, and the "CRRA"[17] against defendants Michaelson, C.M. Collins, C.M. Bement, H.O. Fischer, and Zander, in their official and individual capacities. Id. at 22.

**4.    Factual Basis for Claims in Part 4**

Schuh's final set of claims arises out of an ultimate determination that he did not qualify for work release.

On September 26, 2023, Case Manager Levi Ryan met with Schuh to conduct a custody level reclassification analysis. Id. Schuh's revised score was nine, which put him in the minimum custody level. Id.; see also Doc. 10-2. C.M. Ryan informed Schuh that he should be able to participate in work release. He also informed Schuh that he had consulted with Marsh and Fischer, Directors of the Classification Committee, and neither of them noted any bar to Schuh qualifying for work release. Id. Directors Marsh and Fischer had approved referring Schuh to Hochhalter, a classification specialist, and Lance Anderson, the Warden of Transitional Housing, for transfer. Id. C.M. Ryan informed Schuh he was awaiting Hochhalter's response. Id. at 22-23.

On October 11, 2023, C.M. Ryan asked Hochhalter about Schuh's outstanding non-extraditable warrant from Washington state. Id. Schuh explains the warrant was for a probation violation although it was titled an escape from community custody. According to Schuh, Hochhalter informed C.M. Ryan the warrant would not affect whether Schuh was approved for work release. Id.

---

[17] Schuh offers no explanation for the acronym "CRRA."

Schuh asked his girlfriend to email the exact language of the warrant to C.M. Ryan and C.M. Bement, and Schuh apparently asked them to forward the email to Hochhalter. Id. at 23; (see also Doc. 10-4; Doc. 20, p. 2). The following day, C.M. Bement allegedly informed Schuh that Hochhalter's response indicated his work release review was being delayed because Schuh had not used his assigned case manager to communicate with Hochhalter. Id. Schuh states there was no NDSP rule requiring him to use only his assigned case manager and asserts it was not abnormal to ask another case manager for help when the assigned case manager was not available. Id. Schuh accuses Hochhalter of being unethical and claims Hochhalter retaliated against him because Hochhalter was named in Schuh's prior lawsuit. Id.

Schuh states he wrote a "kite," also referred to as a resident request, to Hochhalter expressing his concerns on October 10, 2023.[18] Id. In the kite, Schuh explained he had not checked in with his Washington state probation officer, which prompted the warrant. (Doc. 10-4). Hochhalter responded that he understood the situation, did not need the Washington statute sent to him, and noted he was hesitant to send Schuh to a community custody setting when there was a pending escape charge regardless of whether it was extraditable. He also wrote that Schuh's past behavior was the best indicator of his future conduct and Schuh had made it very difficult for Hochhalter to approve community custody. Id. Schuh claims Hochhalter's response contradicted his earlier statement that the warrant would not affect his decision and alleges Hochhalter's reasoning conflicted with NDSP policy and procedure. Id.

---

[18] Schuh's timeline of events appears to be inconsistent.

On October 12, 2023, Schuh filed a grievance claiming Hochhalter retaliated against him and treated him unequally because of the prior lawsuit. (Doc. 10-5). Hochhalter denied retaliating and responded that Schuh's case had been reviewed consistently with all other cases and multiple factors counseled against his placement in a work release program. Id. C.M. Ryan reviewed the grievance and Hochhalter's statement on October 17, 2023, and agreed with Hochhalter. Id. C.M. Ryan explained he had not been aware of all the factors at the time the referral was made and whether to grant work release involved discretion. Id. The denial of the grievance was affirmed by H.O. Fischer, who found no retaliation by Hochhalter, and, thereafter, the decision was affirmed at all levels of review, including by the DOCR's Acting Director. Id. at 2-4.

Schuh asserts he was treated differently than other similarly situated inmates who had non-extraditable warrants and were still allowed work release. (Doc. 10, p. 24). He claims disparate treatment because he had previously sued many of these defendants, including Hochhalter. Id. Additionally, Schuh complains about inconsistencies in the grievance process. Id. For instance, he asserts the NDSP used outdated disciplinary history against him and alleges that before Hochhalter became involved, Fischer and Marsh said they saw nothing barring Schuh from participating in work release. Id. He contends there are many other inconsistencies as well. Id. at 24-25. Schuh questions C.M. Ryan's statement that he was not aware of all factors and contends as a case manager, C.M. Ryan should have been aware of those factors. Schuh also points out that he scored zero in the classification category for escape. Id. at 25.

Schuh alleges First Amendment retaliation by "weaponization of the grievance process by knowingly creating a false narrative to prevent [Schuh] from being able to participate in work release[.]" Id. Schuh claims the only reason he was denied work

release was because he exercised his First Amendment rights to bring suit. Id. He states

he had suffered adverse actions since bringing the prior lawsuit and making the

prostitution report. Id. Schuh alleges defendants conspired to interfere with his civil

rights and deprived him of his rights and privileges in violation of 42 U.S.C. § 1985 and

denied him equal rights under the law in violation of 42 U.S.C. § 1981(a)(c). Id.

As to the conspiracy claim, Schuh asserts defendants knowingly conspired to

deny him the opportunity to decrease his custody level and participate in work release or

other programming offered to minimum custody level inmates. Id. at 25-26. He alleges

defendants engaged in this collective effort through various actions, including (1)

refusing to house him among inmates with similar custody levels and knowingly

endangering him; (2) violating public safety and engaging in willful misconduct under

42 U.S.C. § 247d-6d(c); (3) weaponizing the disciplinary, classification, and grievance

processes against him and perpetrating due process violations; (4) retaliating against

him for bringing suit and reporting sexual misconduct by inmates; and (5) creating a

false narrative about his background, write-up history, and criminal records to deny him

work release and parole. Id. Schuh asserts that as a direct result of defendants' actions,

he sustained physical injuries and emotional distress. Id. at 27. Schuh alleges the

conspiracy included all defendants except Gov. Burgum, Chapman, Pineda, and Davis.[19]

Id. at 26.

## Law and Discussion

To state a cognizable claim, a complaint must meet the requirements of Federal

Rule of Civil Procedure 8(a)(2), as interpreted by Bell Atlantic Corp. v. Twombly, 550

---

[19] Schuh also alleges Steve Hall participated in the conspiracy, but Hall is not a named defendant.

U.S. 544 (2007), <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), and their progeny. To meet the <u>Twombly</u>/<u>Iqbal</u> standard, a complaint must present a "plausible" claim and must give the defendants fair notice of the claim and grounds upon which it rests. <u>E.g.</u>, <u>Zink v. Lombardi</u>, 783 F.3d 1089, 1098 (8th Cir. 2015). When the factual content of a complaint allows the court to reasonably infer a defendant is liable for the alleged misconduct, the complaint has stated a facially plausible claim. <u>Iqbal</u>, 556 U.S. at 678. In other words, the complaint must "possess enough heft to 'sho[w] that the pleader is entitled to relief.'" <u>Twombly</u>, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)).

While facts alleged in the complaint are to be accepted as true, conclusory allegations of the elements of a cause of action are insufficient to state a claim that is plausible on its face. <u>Id.</u> In construing a pro se complaint, a court is to take a liberal approach and is to hold a pro se litigant to a less stringent pleading standard than would be required of attorneys. <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007). The court therefore considers the attachments and supplements Schuh filed as part of the complaint. <u>See Kiir v. N.D. Pub. Health</u>, 651 F. App'x 567, 568 (8th Cir. 2016) (construing a pro se plaintiff's amendment as supplementing, rather than supplanting, the original complaint).

But a liberal construction of a pro se pleading does not require a court to supply facts missing from a pro se complaint. <u>See Stone v. Harry</u>, 364 F.3d 912, 914 (8th Cir. 2004). And the court is not required to ignore facts pled by a pro se plaintiff when those facts undermine a plaintiff's claims.[20] <u>Michael v. Clarkson</u>, No. 1:18-cv-118, 2018 WL

---

[20] The Eighth Circuit has upheld the dismissal of a pretrial detainee's claim based, in part, on information contained in grievance response forms submitted with the complaint. <u>Artisani v. Iowa</u>, No. 23-2984, 2024 WL 227974, at *1 (8th Cir. Jan. 22, 2024) (per curiam).

6028698, at *2 (D.N.D. Nov. 16, 2018); Corman v. Sullivan, No. 3:14-cv-32, 2015 WL

3676634, at *3 (D.N.D. June 12, 2015) (citing Edwards v. Snyder, 478 F.3d 827, 830

(7th Cir.2007)) ("[A] plaintiff may unwittingly plead himself out of court by alleging

facts that preclude recovery.").

1.    **Official Capacity Claims Under §§ 1981, 1983, and 1985**

A suit against a state employee in their official capacity is considered to be a suit

against the state. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). And

§ 1983 suits against local government employees in their official capacities are actually

suits against the entity of which the employee is an agent. Brandon v Holt, 469 U.S. 464,

471-72 (1985) (stating "we have plainly implied that a judgment against a public servant

'in his official capacity' imposes liability on the entity that he represents provided, of

course, the public entity received notice and an opportunity to respond. We now make

that point explicit."); Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690, n.55 (1978). Thus,

the official capacity claims against employees of the NDSP, the DOCR, and Gov. Burgum

are construed as against the State of North Dakota.

To adequately state a claim under § 1983, a plaintiff must allege (1) a person

acting under color of state law (2) deprived the plaintiff of rights secured by the

Constitution or laws of the United States. Section 1985 similarly applies when "two or

more persons" conspire to perform enumerated prohibited acts, and Section 1981

protects against "nongovernmental discrimination." States are not "persons" amenable

to suit under any of these statutes. And, under the Eleventh Amendment, states are

immune from suits for money damages in federal courts absent a waiver of that

immunity. Will, 491 U.S. at 66. The State of North Dakota has not waived its Eleventh

Amendment immunity.[21] See N.D. Cent. Code § 32-12.2-10. Schuh is therefore barred from recovering money damages from the state defendants in their official capacities for claims arising under 42 U.S.C. §§ 1981, 1983, and 1985. This court recommends dismissal of those claims.

## 2.    Individual Capacity Claims

"Liability under Section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990) (citing Rizzo v. Goode, 423 U.S. 362, 370 (1976)). Because vicarious liability does not apply to § 1983 actions, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[22] Iqbal, 556 U.S. at 676. In other words, a defendant must have been personally involved in the alleged violation of the plaintiff's rights.

To state a plausible § 1983 claim, the complaint must allege facts showing what each defendant did or failed to do that violated the plaintiff's constitutional rights. Reynolds v. Dormire, 636 F.3d 976, 979 (8th Cir. 2011) (providing a plausible claim for a violation of constitutional rights requires a plaintiff to allege facts that tend to show each individual defendant was personally involved in the alleged violation). Moreover, "a general responsibility for supervising the operations of a prison is insufficient to

---

[21] The court separately addresses Schuh's claims arising under the ADA and the Rehabilitation Act in section 9.

[22] The Eighth Circuit and some district courts have noted that § 1981 claims are seemingly incompatible with vicarious or respondeat superior liability. See Daniels v. Dillard's, Inc., 373 F.3d 885, 888 n.4 (8th Cir. 2004); Moore v. Koenigsfeld, No. 21-CV-52-CJW-KEM, 2021 WL 5764253, at *3 (N.D. Iowa Oct. 10, 2021). The court does not address that issue because Schuh's § 1981 claim fails for the reasons explained in section 8.B.

establish the personal involvement required to support liability." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). "[T]hat harm occurred under [a supervisor's] watch is not the touchstone under § 1983." Marsh v. Phelps Cnty., 902 F.3d 745, 753-54 (8th Cir. 2018).

The court has closely analyzed Schuh's allegations against the named defendants. It is apparent some of the defendants are named only because they are in managerial or supervisory positions. Schuh has not alleged any facts that show personal involvement in any of his claims by Dir. Krabbenhoft, Sayler, Shawn Fode, Steven Foster, Molly Goebel, Davis, or Zander. Therefore, this court recommends those defendants be dismissed because Schuh has failed to state a plausible claim against any of them.

### 3.    Eighth Amendment Claim—Long COVID

Schuh contends he suffers from long COVID symptoms because of defendants' failure to protect him from or exposing him to the COVID virus while incarcerated. (Doc. 10, pp. 14-15, 17). He asserts an Eighth Amendment violation for cruel and unusual punishment, which the court construes as an unconstitutional conditions of confinement claim. Helling v. McKinney, 509 U.S. 25, 31 (1993) (holding that exposure to potential illness is a conditions of confinement claim).

"'[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). But the "Constitution does not mandate comfortable prisons," and only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis" of an Eighth Amendment violation. Hudson v. McMillian, 503 U.S. 1, 9 (1992); Rhodes, 452 U.S. at 349. The Eighth Amendment

requires prison officials to "take reasonable measures to guarantee the safety of the inmates." Farmer, 511 U.S. at 832. "Whether one characterizes the treatment received by [the prisoner] as inhuman[e] conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard . . . ." Helling, 509 U.S. at 32 (internal quotation marks omitted and alteration in original).

To proceed on an Eighth Amendment conditions of confinement claim, Schuh must allege (1) the conditions he endured objectively constituted a substantial risk of serious harm to his health; and (2) the individual defendants were subjectively aware of, but deliberately indifferent to, the risk of harm posed by those conditions. Farmer, 511 U.S. at 836-38; Butler v. Fletcher, 465 F.3d 340, 344-45 (8th Cir. 2006) (holding the deliberate indifference standard applies to claims challenging the adequacy of measures to reduce the risk of infection).

Schuh's exposure to COVID claim arises from a prison tour by Gov. Burgum, executives from Vera Institute and MILPA Connective, and NDSP's administration in May or June 2022.[23] (Doc. 10, p. 15). The tour was part of an event recognizing the Restoring Promise program. Id. Schuh contends the tour was allowed to proceed even though "people in the group" had allegedly tested positive for COVID.[24] Id. Schuh claims defendants "knew we would have a breakout" and alleges a "major breakout" occurred at

_____

[23] Although Schuh alleges the tour took place on June 5, a document in the record shows the Restoring Promise event began on May 24, and the facility tour occurred from 8:00 a.m. to 9:00 a.m. on May 25. (Doc. 19, pp. 1-3).

[24] In a grievance requesting information about the Restoring Promise event, Schuh claimed "your own prison officials admitted they knew people tested positive when they tested these individuals at the gate and did the walk through anyway." (Doc. 19, p. 1).

NDSP beginning on June 10, 2022. Id. Schuh tested positive for COVID around June 14, 2022. Id. Schuh states he learned from a nurse while he was being treated for COVID that "people in the group" tested positive for COVID. But Schuh does not allege any specific defendant knew that information before the event began and deliberately disregarded risks posed by persons in the group having tested positive for COVID.[25]

The deliberate indifference standard requires a plaintiff to show knowledge of a substantial risk by a specific defendant. See Farmer, 511 U.S. at 837 (explaining the prison official must know of and disregard an excessive risk to inmate health or safety). It is an extremely high standard that requires a mental state akin to criminal recklessness. Saylor v. Nebraska, 812 F.3d 637, 644 (8th Cir. 2016). Overbroad, conclusory allegations covering "all defendants" or a group of defendants are insufficient because vicarious liability does not apply in § 1983 actions. See McCollum v. Titus, No. 21-cv-1774, 2022 WL 2496249, at *3 (D. Minn. June 2, 2022), report and recommendation adopted, 2022 WL 2467786 (D. Minn. July 6, 2022) (concluding the plaintiff did not plausibly allege that specific defendants had knowledge of and deliberately ignored his substantial risk of severe illness from COVID); Guirlando v. Union Cnty. Jail, No. 1:21-cv-01013, 2021 WL 4823478, at *13 (W.D. Ark. July 28, 2021) (concluding broad conclusory statements that all defendants failed to protect the plaintiff are insufficient; instead, facts must be alleged establishing each defendant's personal involvement).

---

[25] Nor does Schuh allege that he was in direct contact with anyone in the tour group. (See Doc. 19, p. 1) (indicating Schuh saw people walk through the NDSP North Unit).

Even assuming Schuh plausibly alleges a substantial risk of serious harm to his health, the conclusory assertion that the tour was allowed to proceed does not state a plausible claim. He does not allege that any specific defendant was aware of facts from which it could be inferred that defendant knew of the positive test result and acted with deliberate indifference to the risk to Schuh and other inmates.[26] See Raper v. Braley, No. 4:22-cv-04057, 2023 WL 4422860, at *5 (W.D. Ark. July 10, 2023) (concluding the plaintiff's allegations that the defendant came to work after caring for sick family members, continued to work after contracting COVID, and did not follow Centers for Disease Control and Prevention guidelines was at most negligent and did not meet the deliberate indifference standard); McCollum, 2022 WL 2496249, at *6 (recommending dismissal of the complaint because it failed to allege specific defendants had knowledge of a substantial risk to the plaintiff from COVID and deliberately ignored the risk or failed to act).

Accordingly, this court recommends dismissal of Schuh's Eighth Amendment conditions of confinement claim based on contracting COVID and allegedly suffering from long COVID symptoms.

**4.    Claim Under 42 U.S.C. § 247d-6d(d)**

Schuh alleges a willful misconduct claim under the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. § 247d-6d. (Doc. 10, pp. 11, 17).

---

[26] It is further questionable whether Schuh's allegations would set forth a cognizable claim based on a COVID outbreak at NDSP. See Raper v. Braley, No. 4:22-cv-04057, 2023 WL 4422860, at *6 (W.D. Ark. July 10, 2023) (stating that "even assuming that '250 residents, including Plaintiff, contracted COVID-19,' the scope of the alleged injury is not pertinent to the Court's deliberate indifference analysis.").

This claim is brought against Chapman, Vera Institute of Justice, Pineda, MILPA Connective, the State of North Dakota, and Gov. Burgum. Id. at 17.

The PREP Act authorizes the Secretary of Health and Human Services to issue a declaration of a public health emergency, like the one issued for the COVID pandemic. See 42 U.S.C. § 247d-6d(a)(1); Notice of Decl., 85 Fed. Reg. 15198 (Mar. 17, 2020). Once such a declaration is made, certain countermeasures may be recommended and covered individuals are granted immunity from claims related to the administration of those countermeasures. 42 U.S.C. § 247d-6d(a)(1), (b)(1). There is an exception for claims causing death or serious physical injury as a result of a defendant's willful misconduct, which provides, in part,

> Subject to subsection (f), the sole exception to the immunity from suit and liability of covered persons set forth in subsection (a) shall be for an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct . . . by such covered person.

Id. § 247d-6d(d)(1).

"Willful misconduct" means "an act or omission that is taken—(i) intentionally to achieve a wrongful purpose; (ii) knowingly and without legal justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit." Id. § 247d-6d(c)(1). That standard is "more stringent than a standard of negligence in any form or recklessness." Id. § 247d-6d(c)(1)(B). The PREP Act requires each element of the claim to be pled with particularity, including (1) each act or omission, by each covered person sued, that is alleged to constitute willful misconduct; (2) facts supporting that the alleged willful misconduct proximately cause the injury; and (3) facts supporting the allegations of serious bodily injury. Id. § 247d-6d(e)(3).

Schuh's allegations are woefully short of meeting the particularity requirements for a willful misconduct claim. (Doc. 10, p. 17). His allegations merely assert,

> Additionally, for know[i]n[g]ly participating in the tour of the prison while positive for COVID that resulted in injury . . . and irreparable harm (long-COVID). The Petitioner has a right to public safety. The following violated the Petitioner's rights consistent with 42 U.S.C. § 247d-6d(c) willful misconduct.
>
> Vera Institute of Justice, Senior Program Associate (Clinique Chapman)
> MILPA Connective, Deputy Director (John Pineda)
> The State of North Dakota, (Governor Doug Burgum)

Id.

Broad, nonspecific allegations, like these, fail to state a claim. E.g., Friedman v. Montefiore, 610 F. Supp. 3d 1032, 1043 (N.D. Ohio 2022) (concluding allegations that the defendants "'intentionally hid the fact that other patients and/or residents' had tested positive for the virus, and this *resulted* in residents being unknowingly exposed" to COVID were insufficient because "the complaint does not allege that defendants did this 'to achieve a wrongful purpose.'").

Even if the court were to conclude, which it does not, that Schuh met the particularity requirements by asserting sufficient facts to meet the standard of "willful misconduct" and "serious bodily injury," the claim could not be allowed to proceed in this jurisdiction.[27] The PREP Act provides exclusive jurisdiction for such claims in the District Court for the District of Columbia. See 42 U.S.C. § 247d-6d(e)(1) ("Any action under subsection (d) shall be filed and maintained only in the United States District

---

[27] The PREP Act requires administrative exhaustion before a plaintiff may initiate a civil suit. 42 U.S.C. § 247d-6e(d)(1). The exhaustion requirement applies with only limited exceptions and requires a plaintiff to seek payment from the Covered Countermeasure Process Fund before filing a lawsuit. See id.; Fisher, 2022 WL 16949603, at *4. There is no indication Schuh followed the administrative process before filing this suit.

Court for the District of Columbia."). The exclusive jurisdiction provision is enforced by district courts outside of the District of Columbia. See, e.g., Baghikian v. Providence Health & Servs., CV 23-9082, 2024 WL 487769, at *5 (C.D. Cal. Feb. 6, 2024); Fisher v. Rome Ctr. LLC, No. 6:22-CV-0685, 2022 WL 16949603, at *4 (N.D.N.Y. Nov. 15, 2022), appeal dismissed, No. 22-3140, 2023 WL 8802543 (2d Cir. June 15, 2023); Perez v. Oxford Univ., No. 21-CV-4844, 2022 WL 1446543, at *5-6 (S.D.N.Y. Apr. 11, 2022), report and recommendation adopted, 2022 WL 1468438 (S.D.N.Y. May 10, 2022) (collecting cases); Mason v. Loris Rehab & Nursing Ctr., LLC, No. 4:21-cv-01485, 2021 WL 7541157, at *4 (D.S.C. Dec. 16, 2021). Accordingly, this court recommends dismissal of Schuh's claim under the PREP Act, 42 U.S.C. § 247d-6d.

**5.    First Amendment Retaliation Claims**

Schuh alleges two claims of First Amendment retaliation, each arising under separately alleged facts discussed below. (Doc. 10, pp. 11-12). To state a plausible First Amendment retaliation claim, a plaintiff must allege (1) they engaged in a protected activity, (2) the defendant took adverse action that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated by the plaintiff engaging in the protected activity. See Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013); Potter v. Echele, No. 4:19-cv-2234, 2020 WL 1494087, at *9 (E.D. Mo. Mar. 23, 2020). The ordinary-firmness test is designed to distinguish trivial matters from substantial First Amendment violations. Gonzalez v. Bendt, 971 F.3d 742, 745 (8th Cir. 2020) (citing Santiago, 707 F.3d at 992). "The test is an objective one, not subjective." Id. The question is not whether the plaintiff was deterred, but "[w]hat would a person of 'ordinary firmness' have done in reaction to the [adverse action]?" Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003)).

### A.    Alleged Report of Prostitution

Schuh's first claim of retaliation centers on a written report he made to the NDSP treatment department alleging a transgender inmate was engaging in prostitution during Sgt. Bryant's shifts.[28] (Doc. 10, p. 14). Ultimately, Schuh's report could not be substantiated because there were no cameras in the area where the activity reportedly occurred. Id. Schuh alleges Sgt. Bryant retaliated by writing him up for loitering in the day room on May 7, 2022, which he claims is an unrestricted area, and for threatening Sgt. Bryant on June 15. Id. The June 15 write-up stemmed from Schuh's initial refusal to go the COVID isolation dorm after he tested positive for COVID. Id. at 15. After speaking with Capt. Helgeson, Schuh agreed to go to the dorm instead of the "hole" but was nonetheless taken to the "hole." Id. at 16. Schuh claims Sgt. Bryant lied to the other officers and Schuh was sent to administrative segregation for fourteen days in retaliation for making the prostitution report. Id. at 16. He also contends he was punished for raising genuine medical questions about the risks of further infection from being placed in the COVID dorm. Id.

A prisoner has a right to be free from retaliation for using a grievance process.[29] Santiago, 707 F.3d at 991; Nelson v. Shuffman, 603 F.3d 439, 450 (8th Cir. 2010) (stating "actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983"). The adverse action taken in retaliation "does not itself [have to] rise to the level of a constitutional violation[.]" Santiago, 707 F.3d at 994. But

---

[28] There is no allegation Sgt. Bryant was involved in the alleged prostitution.

[29] For purposes of this initial review, the court analogizes the prostitution report to a grievance.

"[s]peculative and conclusory, or de minimus allegations cannot support a retaliation claim." May v. Tims, No. 421-cv-00255, 2023 WL 2164190, at *8 (E.D. Ark. Feb. 22, 2023), report and recommendation adopted as modified, No. 4:21-CV-00255, 2023 WL 2390693 (E.D. Ark. Mar. 7, 2023), aff'd, No. 23-1867, 2023 WL 7190170 (8th Cir. Sept. 18, 2023) (citing Atkinson v. Bohn, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam) (holding speculative and conclusory claims of retaliation insufficient).

To state a plausible retaliation claim, Schuh must allege sufficient facts from which it can be inferred that the adverse action was motivated by his protected activity. See Santiago, 707 F.3d at 991. "Temporal proximity is relevant but not dispositive." Wilson v. Northcutt, 441 F.3d 586, 592 (8th Cir. 2006); see also Taylor v. Bailey, 494 F. App'x 674, 675 (8th Cir. 2012) (per curiam) (observing that temporal proximity may support causality when the proximity is very close, citing Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1087-88 (8th Cir. 2010)).

Here, Schuh's complaint includes no details raising an inference that Sgt. Bryant had a plausible motive or intention to retaliate. In this court's view, Schuh is merely speculating that Sgt. Bryant's action of writing him up for loitering in the dayroom or sending him to the "hole" were made in retaliation for the report of prostitution. Schuh's belief that Sgt. Bryant acted with a retaliatory motive is not enough. Wilson, 441 F.3d at 593. As another district court observed, "courts have stressed that while temporal proximity between the protected conduct and the allegedly retaliatory act may provide indirect evidence of the defendant's motive to retaliate . . . it is usually coupled by other indicators of intent . . . ." Pasha v. Payton, No. 28-595-DCR, 2019 WL 440573, at *9 (E.D. Ky. Feb. 4, 2019) (dismissing retaliation claim on § 1915A review where an inmate alleged no facts supporting his transfer being motivated by his PREA claim).

26

The court has liberally reviewed the complaint and accompanying documents as a whole for evidence that might support Schuh's retaliation claim. It has found none. There is no indication Sgt. Bryant was reprimanded or disciplined because of the prostitution report, which might suggest a retaliatory motive. And Schuh admits the prostitution accusation could not be corroborated during the investigation due to lack of video footage and no actions were taken because of the report. (Doc. 10, p. 14). Nor does Schuh allege Sgt. Bryant made comments from which one could infer a retaliatory motive or assert a history of antagonism between them.[30]

Schuh's assertion of a retaliatory motive relies solely on a temporal connection, but because Schuh does not allege the date he made the report of prostitution, the court cannot determine whether Schuh's May 7 write-up for loitering occurred within days of the report, or weeks, or months later. The June 15 write-up for threatening Sgt. Bryant, occurring five weeks after the loitering write-up, is even more remote. See Blackmon v. Lombardi, 527 F. App'x 583 (8th Cir. 2013) (per curiam) (concluding an allegation that an inmate was threatened with segregation if he filed more grievances and an allegation that 30 minutes after the inmate filed a grievance he was placed in the segregation unit sufficiently alleged First Amendment retaliation); Taylor, 494 F. App'x at 675 (concluding an inmate stated a plausible retaliation where the inmate alleged a supervisor confronted him over a pending lawsuit and six days later placed him in administrative segregation).

---

[30] Sgt. Bryant was not a named defendant in Schuh's prior lawsuit.

Because Schuh fails to allege facts sufficient to support a First Amendment retaliation claim based on the alleged report of prostitution, this court recommends dismissal of Schuh's retaliation claim against Sgt. Bryant.[31]

### B.     Prior Lawsuit Naming Hochhalter

Schuh's second retaliation claim is against Hochhalter. Schuh claims Hochhalter denied him the opportunity for work release in retaliation for being named as a defendant in his prior lawsuit. (Doc. 10, p. 23). The court concludes Schuh's allegations are insufficient to state a plausible claim. Though Hochhalter was a named defendant in the prior lawsuit, the claims against him were dismissed during the initial review. See Schuh, 1:22-cv-026, Docs. 20, 25. Hochhalter was terminated as a defendant on May 19, 2022, along with nineteen other defendants. Schuh does not allege Hochhalter was affected by his prior lawsuit in any way. And it is speculative to conclude Hochhalter's decision to disapprove work release for Schuh in October 2023 was based on a retaliatory animus connected to the prior lawsuit from which Hochhalter had been dismissed in May 2022. Atkinson, 91 F.3d at 1129 (dismissing retaliation claim where no allegations indicated the defendants were involved in or affected by the plaintiff's previous litigation and the plaintiff failed to allege facts of sufficient retaliatory animus). Accordingly, this court recommends dismissing the retaliation claim against Hochhalter.

---

[31] To the extent that Schuh claims Sgt. Bryant retaliated against him by placing him in the same unit with inmate Johnathan Larson, that fails the plausibility standard for the same reasons.

6.    **Due Process Claims**

A.    **Disciplinary Hearing**

Schuh complains his right to due process was violated because he was not allowed to call witnesses, present evidence, obtain video, or confront Sgt. Bryant at the disciplinary hearing on the write-ups for the 229 and 230 infractions. (Doc. 10, pp. 16-17). He states because he was found to have committed the infractions, he lost his housing and job and was degraded to a medium custody level. Id. at 16. These allegations can be interpreted as claiming a violation of procedural due process, but such a claim is not actionable in this context.

Prisoners are entitled to protections of the Due Process Clause and may not be deprived of liberty or property without due process of law. See Sandin v. Conner, 515 U.S. 472, 485 (1995) ("Admittedly, prisoners do not shed all constitutional rights at the prison gate . . . .") But a procedural due process claim lies only "if there is a recognized liberty or property interest at stake," and courts "need reach the question of what process is due only if the inmate[ ] establish[es] a constitutionally protected liberty interest." Beaulieu v. Ludeman, 690 F.3d 1017, 1047 (8th Cir. 2012) (internal citations omitted).

The Supreme Court has held prisoners have a protected liberty interest in avoiding conditions of confinement that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. The ordinary incidents of prison life necessarily involve significant restrictions. Id. at 485 ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.") (internal quotations omitted). Thus, courts have held that placement in

disciplinary segregation or administrative segregation, temporary loss of visitation rights, loss of contact visitation, and restrictions on exercise do not create an atypical and significant hardship under <u>Sandin</u>.[32] <u>Phillips v. Norris</u>, 320 F.3d 844, 846-47 (8th Cir. 2003) (collecting cases).

The Eighth Circuit has held that neither loss of privileges nor reclassification of a custody level states a due process claim. <u>Thornsberry v. Barden</u>, 854 F. App'x 105 (8th Cir. 2021) (concluding "Thornsberry's assignment to isolation, loss of privileges, and reclassification were insufficient to state a due process claim"); <u>Smith v. McKinney</u>, 954 F.3d 1075, 1082 (8th Cir. 2020) (holding a demotion to segregation or being deprived of commissary, phone, or visitation privileges do not involve atypical and significant hardships); <u>Persechini v. Callaway</u>, 651 F.3d 802, 807 n.4 (8th Cir. 2011) (stating inmates do not have a liberty interest in maintaining a particular classification level). Furthermore, Schuh's alleged loss of a job and an opportunity to participate in work release do not involve a protected liberty or property interest. <u>Battle v. Minn. Dep't of Corr.</u>, 40 F. App'x 308, 309 (8th Cir. 2002) (holding a prisoner had no protected liberty or property right to be assigned a prison job or to be allowed to participate in educational programs); <u>Brady v. Norris</u>, No. 5:08cv00147, 2008 WL 5002929, at *4 (E.D. Ark. Nov. 20, 2008) (observing that an inmate has no federal due process right to participate in a work release program and holding an inmate's (as opposed to parolee's) removal from a work release job implicated no liberty interest protected by the Due

---

[32] Nor is there is a liberty interest in having prison officials follow prison regulations. <u>Phillips</u>, 320 F.3d at 847; <u>Monteer v. ABL Mgmt. Inc.</u>, No. 4:21-CV-756, 2021 WL 3570301, at *7 (E.D. Mo. Aug. 12, 2021), <u>reconsideration denied,</u> No. 4:21-CV-756, 2021 WL 3847137 (E.D. Mo. Aug. 27, 2021) (concluding on initial review that allegations of failing to follow jail policy did not state a claim upon which relief could be granted).

Process Clause). To the extent Schuh contends the disciplinary reports included lies and false information, that too, standing alone, is not actionable.[33] See Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (holding that claims based on falsity of disciplinary charges, standing alone, do not state constitutional claims).

Because Schuh has not alleged a liberty interest protected by Sandin was at stake during his disciplinary hearing, the court does not need to determine the extent of the process to which he was entitled.[34] Accordingly, this court recommends dismissal of his due process claim stemming from the disciplinary hearing.

### B. Grievance Process

Liberally construing the complaint, the court also considers an alleged due process violation arising from the handling of Schuh's grievance alleging retaliation and discrimination for denying work release placement. (Doc. 10, pp. 24-25). Schuh claims NDSP used stale disciplinary history against him and submitted contradictory statements during the grievance process. Id. at 24. He states his grievance appeal explained how NDSP's position conflicted with DOCR policies and relied on inconsistent information. Id. Schuh also accuses C.M. Ryan of being untruthful. Id. at 24-25.

---

[33] The Eighth Circuit has recognized an allegedly false disciplinary charge may be actionable if the charge was issued in retaliation for an inmate's exercise of a constitutional right. Sanders v. Hobbs, 773 F.3d 186, 190 (8th Cir. 2014). The court considered Schuh's allegations of First Amendment retaliation in section 5.A.

[34] Sandin establishes that the procedural due process protections set out in Wolff v. McDonnell, 418 U.S. 539 (1974), including the right to present witnesses and documentary evidence, do not apply if there is no liberty interest at stake. Sandin, 515 U.S. at 487; see also Moore v. McDowell, No. 5:19CV00191, 2019 WL 13378034, at *4 (E.D. Ark. Dec. 11, 2019), report and recommendation adopted, No. 5:19-cv-00191, 2021 WL 1287856 (E.D. Ark. Jan. 22, 2021) (observing the same).

These types of complaints about a grievance process, in general, and the processing of Schuh's grievance specifically, do not rise to the level of a constitutional violation. See Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (holding a prison official's failure to process or investigate grievances, without more, is not actionable under § 1983); Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991) (per curiam) ("When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance."); see also King v. Houston, 556 F. App'x 561, 563 (8th Cir. 2014) (holding allegations that prison officials did not adequately consider an inmate's grievance did not state a claim); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (opining the Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state); Running Bird v. Mertens-Jones, No. 4:21-CV-04197-KES, 2022 WL 252091, at *2 (D.S.D. Jan. 27, 2022) (dismissing an inmate's claim that the way grievances were processed violated his rights); Dickens v. Taylor, 464 F. Supp. 2d 341, 354 (D. Del. 2006) (concluding a prisoner "cannot maintain constitutional claims based upon an inadequate grievances system, that grievances were denied, that he was not provided a hearing upon the filing of a grievance, or that his grievances were not addressed").

Thus, this court recommends Schuh not be allowed to proceed with a procedural due process claim regarding the NDSP grievance procedure.

**7.    Failure to Protect Claim**

Schuh's failure to protect claim stems from his alleged assault by Johnathon Larson, a maximum custody inmate. The Eighth Amendment imposes a duty on prison

officials "to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833.

To state an Eighth Amendment claim for failure to protect, Schuh must show that prison officials acted with a deliberate indifference to a substantial risk of serious harm by Larson. See Vandevender v. Sass, 970 F.3d 972, 975 (8th Cir. 2020). Elements of this claim include both objective and subjective components. The objective component requires a substantial risk of serious harm to the prisoner, and the subjective component requires knowledge by the prison official of the substantial risk and failure to take reasonable steps to abate it, i.e., "deliberate indifference." Farmer, 511 U.S. at 834, 837. "To be liable, 'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Vandevender, 970 F.3d at 975 (quoting Farmer, 511 U.S. at 837).

Both elements must be alleged with sufficient factual detail to state a plausible claim. However, because "prisons are inherently dangerous environments, 'it is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials.'" Id. at 976 (quoting Farmer, 511 U.S. at 834). Here, Schuh simply alleges he was assaulted by Larson, a maximum custody inmate, and claims he (Schuh) should have been housed with inmates with a similar custody classification. (Doc. 10, p. 18). These allegations are insufficient for the reasons explained in the Vandevender decision. See id.

As discussed in Vandevender, failure-to-protect cases arising out of an inmate-on-inmate assault usually involve an attacker who was known to be volatile and dangerous, who previously threatened or fought with the victim, or had previously made threats to harm the victim or other inmates. Id. In such cases, the substantial risk of

serious harm is obvious. But cases involving a single, isolated unprovoked attack are different and, without more, do not allege a sufficient basis for liability. Id. at 977. Here, Schuh has not alleged any facts to demonstrate Larson posed an objective substantial risk of harm to Schuh. There are no allegations that Larson was known to be violent and volatile within the prison, that Larson had previously threatened Schuh, or that the two had previously argued or fought. Like in Vandevender, the fight between Larson and Schuh appears to have been a single, isolated incident that fails to state a plausible claim for failure to protect. This claim should be dismissed.

**8.    Equal Protection Claims**

    **A.    Fourteenth Amendment**

The Equal Protection Clause of the Fourteenth Amendment mandates that similarly situated persons be treated similarly. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985). This requirement extends to prison inmates. Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 984 (8th Cir. 2004). If a plaintiff does not claim to be a member of a protected class or allege a deprivation of fundamental right, the challenged actions are evaluated under a "rational basis" test. See Flowers v. City of Minneapolis, Minn., 558 F.3d 794, 799 (8th Cir. 2009); Nolan v. Thompson, 521 F.3d 983, 989-90 (8th Cir. 2008).

Schuh does not allege a claim  based on his membership in a protected class. And the conditions to which Schuh alleges he was subjected—being denied work release at the NDSP—do not infringe upon a fundamental right; Schuh does not have a fundamental right to either placement in a particular facility or to any custody classification. See Meachum v. Fano, 427 U.S. 215, 224 (1976) (stating the "Constitution does not . . . guarantee that the convicted prisoner will be placed in any particular

prison"); Moorman v. Thalacker, 83 F.3d 970, 973 (8th Cir. 1996) (stating "there is no liberty interest in assignment to any particular prison"); Cornell v. Woods, 69 F.3d 1383, 1387-88 (8th Cir. 1995) (observing that prisoners enjoy no constitutional right to remain in a particular institution). Accordingly, Schuh's allegations can only be construed as raising a "class of one" equal protection claim, i.e., that defendants "singled him out" and "intentionally treated him differently from others similarly situated, and there is no rational basis for the difference in treatment." See Flowers, 558 F.3d at 799 (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000)). Having reviewed the complaint, this court concludes Schuh has not articulated a cognizable class-of-one equal protection claim for being denied work release.

Generally, no constitutional claim arises from discretionary decision-making. See Engquist v. Or. Dep't of Agr., 553 U.S. 591, 603 (2008). The Supreme Court has explained that where state action necessarily involves discretionary decision-making based on many subjective, individualized assessments, "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." Id. The Eighth Circuit has also cautioned that a class-of-one theory is a "poor fit" in a context that involves discretionary decision-making. Flowers, 558 F.3d at 799-800 (holding decisions regarding whom to investigate and how to investigate "necessarily involve discretion" and cannot be attacked in a class-of-one equal-protection claim).

This district has previously recognized the "poor fit" of class-of-one equal protection claims in the context of inmate complaints involving discretionary decisions. E.g., Cartwright v. Krabbenhoft, No. 1:22-cv-025, 2022 WL 2293976, at *3 (D.N.D. May

2, 2022) report and recommendation adopted, 2011 WL 2291966 (D.N.D. June 24, 2022) (concluding decisions regarding the appropriate course of medical treatment involve discretionary decision making which does not constitute a basis for cognizable class-of-one equal protection claim). And other district courts in this circuit have declined to recognize class-of-one claims against prison officials who make discretionary decisions regarding prisoners. See, e.g., Abram v. Frakes, No. 8:20CV437, 2021 WL 4861278, at *3 (D. Neb. Oct. 19, 2021) (dismissing the plaintiff's class-of-one theory for denial of request for furlough on preliminary screening); Robertson v. Kelly, No. 5:18-cv-00152, 2019 WL 1325921, at *3 (E.D. Ark. Mar. 25, 2019) (stating the determination of how to treat a prisoner on suicide watch involves a case-by-case determination based on a discretionary, subjective, and individualized assessment and is not amenable to class-of-one equal protection claim); McDonald v. Golden, No. 1:17CV00066, 2018 WL 4001278, at *4 (E.D. Ark. July 24, 2018), report and recommendation adopted, 2018 WL 3999699 (E.D. Ark. Aug. 21, 2018) ("Due to the inherently discretionary and individualized nature of the decisions made by state actors charged with managing and caring for prisoners, courts have recognized that prisoners' class-of-one claims alleging arbitrary treatment by prison officials generally are not cognizable under Engquist.").

Decisions regarding which inmates qualify for work release or other minimum custody placements involve discretionary decision-making based on a vast array of subjective, individualized assessments. Schuh's contentions regarding work release and minimum custody placement involve discretionary decision-making, which are not amenable to a class-of-one equal protection theory. Accordingly, this court recommends that claim be dismissed.

**B.    Section 1981 Claim**

Under 42 U.S.C. § 1981, Schuh also alleges a violation of his right to equal protection of the law. Section 1981 provides in relevant part that "all persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. The purpose of the statute is to prohibit racial discrimination in the "performance, modification and termination of contracts and to protect the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." Williams v. Lindenwood Univ., 288 F.3d 349, 355 (8th Cir. 2002) (internal quotations omitted). Section 1981 is generally enforced against private parties and is limited to discrimination based on race.[35] Jones v. McNeese, 746 F.3d 887, 896 (8th Cir. 2014).

Schuh has not stated a plausible claim under § 1981. First, he does not allege he was deprived of any contractual rights within the scope of § 1981. Nor does Schuh allege any deprivations based on his race; in fact, there is no mention of his race, ancestry, or ethnicity in his complaint. See Gooden v. Corbin, No. 4:22-cv-00399, 2023 WL 3860447, at *5 (S.D. Iowa Apr. 26, 2023) (dismissing § 1981 claim as frivolous where the plaintiff did not allege he was prevented from entering into contracts because of his race). Second, because defendants in this action, with the exception of Chapman and

---

[35] In Jones, the Eighth Circuit held that "[a]lthough § 1981 permits a cause of action against private actors, where . . . a plaintiff brings a claim pursuant to § 1981 against an individual who was acting under color of law, the claim must be asserted through § 1983." Jones, 746 F.3d at 896. In other words, a claim against state actors under § 1981 is not proper.

Pineda, are state actors, Schuh's claims may only be asserted through § 1983.[36] See
Brothers Market, LLC v. City of St. Louis, No. 4:20-cv-01174, 2021 WL 778891, at *2
(E.D. Mo. Mar. 1, 2021) (dismissing § 1981 claims against a state actor under the rule in
Jones). Therefore, Schuh's § 1981 claim is not plausible and should be dismissed.

### 9.      ADA and Rehabilitation Act Claims

#### A.      Disparate Treatment and Failure to Accommodate

As an initial matter, neither Title II of the ADA nor the Rehabilitation Act provide
for individual liability for discrimination. Dinkins v. Corr. Med. Servs., 743 F.3d 633,
634 (8th Cir. 2014) (per curiam) (affirming dismissal of individual capacity claims
under ADA and Rehabilitation Act); Baribeau v. City of Minneapolis, 596 F.3d 465, 484
(8th Cir. 2010) (stating "individuals in their personal capacities, however, are not
subject to suit under Title II, which provides redress only from public entities"); Mesey
v. St. Francois Cnty., Mo., No. 4:22 CV 1102, 2023 WL 5748416, *3 (E.D. Mo. Sept. 6,
2023); Damron v. N.D. Comm'r of Corr., 299 F. Supp.2d 970, 976 (D.N.D 2004).
Accordingly, the ADA and Rehabilitation Act discrimination claims against defendants
in their individual capacities should be dismissed. The court examines Schuh's suit
against defendants in their official capacities as a suit against the public entity, NDSP, a
division of the DOCR.[37]

---

[36] The § 1981 claim against Chapman and Pineda fails for lack of allegations of
racial animus. And Schuh does not allege facts supporting personal involvement by
either Chapman or Pineda. The court notes Pineda was not listed as a participant on the
itinerary for the Restoring Promise event nor identified in response to Schuh's request
for information about who participated in the event. (Doc. 19, pp. 1-2).

[37] A "public entity" is defined to include "any State or local government" and "any
department, agency, special purpose district, or other instrumentality of a State . . . ." 42
U.S.C. § 12131(1)(A) and (B). Because the court concludes Schuh's disability
discrimination allegations fail to state a plausible claim, whether the ADA validly

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."[38] 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the ADA and section 504 of the Rehabilitation Act apply to inmates of state correctional facilities. See Rinehart v. Weitzell, 964 F.3d 684, 688 n.4 (8th Cir. 2020); Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999); Burke v. N.D. Dep't of Corr. & Rehab., 620 F. Supp. 2d 1035, 1060 (D.N.D. 2009).

Disability discrimination claims may arise in various forms including intentional discrimination, failure to make reasonable accommodations, and retaliation. Peebles v. Potter, 354 F.3d 761, 765 (8th Cir. 2004); Rinehart, 964 F.3d at 689. Schuh claims all three forms of discrimination under both the ADA and the Rehabilitation Act. Because the ADA and the Rehabilitation Act are similar in substance, with exception of the federal funding requirement under the latter, "cases interpreting either are applicable

---

abrogated a state's Eleventh Amendment immunity for purposes of recovering monetary damages is not addressed. See United States v. Georgia, 546 U.S. 151 (2006) (requiring a claim-by-claim determination of whether Congress validly abrogated state sovereign immunity by enacting the ADA); Klinger v. Dir., Dep't of Rev. State of Mo., 455 F.3d 888 (8th Cir. 2006).

[38] Schuh cited 42 U.S.C. § 12112, which is part of Title I of the ADA and addresses disability discrimination in employment. Liberally construing the complaint, the court reviews the claim under § 12321.

and interchangeable," and the court examines the claims together.[39] Randolph, 170 F.3d at 858. To state a plausible claim for intentional disability discrimination or failure to accommodate, Schuh must allege (1) he had a qualifying disability, (2) he was excluded from participating in or denied the benefits of a program or activity of the NDSP, and (3) the reason for the denial or discrimination was because of his disability. See Turner v. Mull, 784 F.3d 485 (8th Cir. 2015); Baribeau, 596 F.3d at 484; Rogers, 170 F.3d at 858. Intentional discrimination is also referred to as disparate treatment, and a key element of a claim is that a disabled person is treated differently than similarly situated non-disabled persons because of his disability. Peebles, 354 F.3d at 766.

Here, Schuh alleges he has been diagnosed with generalized anxiety disorder and may be autistic, he struggled with the computer class because of his conditions, and Michaelson treated him differently than other persons by not allowing him to transfer out of the computer class. Although, liberally construed, those allegations may satisfy some of the requirements for a plausible claim, Schuh does not allege he was denied a transfer because of his alleged disability. Under the Twombly/Iqbal pleading standard, it is not enough for Schuh to simply allege he was treated differently. There must be some factual allegations that plausibly link the alleged disparate treatment to his alleged disability. Here, Schuh offers none.

Schuh's failure to make reasonable accommodations claim also fails the plausibility standard. Schuh does not allege he requested an accommodation for his conditions that would have allowed him to complete the computer course and capstone

---

[39] Schuh alleged the federal funding requirement for purposes of the Rehabilitation Act.

project.[40] See, e.g., Counts v. Wasko, 4:23-CV-04103-KES, 2023 WL 8237762, at *11, 26 (D.S.D. Nov. 28, 2023) (allowing an inmate's ADA claim for failure to accommodate to proceed where the inmate had requested accommodations); Renteria v. Neb. Dep't of Corr. Servs., No. 8:20CV166, 2021 WL 4521341, at *3 (D. Neb. Oct. 4, 2021) (granting the defendant summary judgment on an ADA claim where the inmate did not request an accommodation for his disability). For these reasons, this court recommends dismissal of Schuh's ADA and Rehabilitation Act disparate treatment and failure to accommodate claims.

**B.    Retaliation**

Schuh also claims retaliation in violation of the ADA and the Rehabilitation Act. (Doc. 10, p. 12). Title V of the ADA prohibits retaliating "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). To establish unlawful retaliation, Schuh must show "(1) he engaged in statutorily protected activity, (2) adverse action was taken against him; and (3) a causal connection exists between the adverse action and protected activity." Rinehart, 964 F.3d at 689. Schuh fails to state a plausible claim because he does not allege he engaged in protected activity under the ADA or the Rehabilitation Act and was retaliated against because of that activity. This court recommends dismissal of the retaliation claims under the ADA and the Rehabilitation Act.

---

[40] Schuh's only assertion that he requested an accommodation was during his disciplinary hearing. The hearing officers reduced the severity of the infraction from a level III to a level II incident, and Schuh lost his job as a sanction. (Doc. 10, pp. 20-21).

10.    **Conspiracy and § 1985(3) Claim**

Schuh purports to bring a conspiracy claim under 42 U.S.C. § 1985(3). Section 1985 is a post-Civil War statute that generally proscribes private conspiracies to interfere with the civil rights of others. Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); Harrison v. Springdale Water & Sewer Comm'n, 780 F.2d 1422, 1429 (8th Cir. 1986). Subsection 3 allows for a claim of damages if "two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the law." 42 U.S.C. § 1985(3). Elements of a § 1985 conspiracy claim include a racial or class-based discriminatory animus behind the alleged actions. Federer v. Gephardt, 363 F.3d 754, 758 (8th Cir. 2004) (citing Griffin, 403 U.S. at 102).

To state a plausible claim for conspiracy under § 1985, Schuh must allege (1) a conspiracy, (2) for the purpose of depriving . . . another of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) an injury to a person or property or the deprivation of a legal right. Id. A conspiracy requires a "meeting of the minds" between the conspirators, meaning the parties agreed to participate in or to form the alleged conspiracy. See Kelly v. City of Omaha, 813 F.3d 1070, 1077-78 (8th Cir. 2016). The allegations of a conspiracy claim must be pleaded with specificity with enough factual support to suggest a meeting of the minds directed toward violating Schuh's federal rights. See id. Conclusory allegations of a conspiracy are insufficient.

Even under a liberal review of the complaint, there are no allegations that suggest defendants reached an agreement to violate Schuh's constitutional or other federal

rights, nor that they did so because of racial or class-based animus. Schuh fails to state a plausible § 1985 conspiracy claim, and the claim should be dismissed.

## 11.    Other Claims

Finally, Schuh purports to bring discrimination claims under Title VI and Title VII of the Civil Rights Act of 1964, and a violation of the CRRA. (Doc. 10, p. 12).

Title VI, 42 U.S.C. §§ 2000d-2000d-6, prohibits discrimination based on race, color, and national origin in programs that receive federal financial assistance. Title VII, 42 U.S.C. §§ 2000e-2000e-17, protects employees and job applicants from employment discrimination based on race, color, religion, sex, and national origin. Because Schuh has not alleged facts that implicate discrimination based on any of those protected categories, those claims should be dismissed.

As to the CRRA claim, Schuh does not identify the basis of the claim. The court's research indicates multiple possibilities. The acronym could refer to the Civil Rights Reviewing Authority, which is an administrative adjudicative authority established under the Department of Education, 34 C.F.R. §§ 21.50-21.56, or it might refer to the Community Risk And Resiliency Act, a New York state law. See New York Dep't of Env. Conser., Community Risk And Resiliency Act, https://dec.ny.gov/environmental-protection/climate-change/new-york-response/crra (last visited Apr. 25, 2024). Neither is applicable here. Because Schuh fails to even identify the law to which he refers, this court recommends dismissal of that claim.

## Recommendation

Because Schuh has failed to state a plausible claim against any defendant, the court **RECOMMENDS** his complaint, (Doc. 10), be dismissed and his motion for service of the complaint and summonses on the named defendants, (Doc. 26), be

denied. Because any appeal would be frivolous and could not be taken in good faith, this court further **RECOMMENDS** the district judge find any appeal may not be taken in forma pauperis.

### ORDER

Schuh objected to this court's January 17, 2024 Order denying his motion to change venue. This court construes that objection as a motion for reconsideration. Because Schuh has failed to state a plausible claim against any defendant, it is **ORDERED** that his motion for reconsideration, (Doc. 18), is **DENIED**.

Dated this 29th day of April, 2024.

/s/ Alice R. Senechal
Alice R. Senechal
United States Magistrate Judge

### NOTICE OF RIGHT TO OBJECT[41]

Plaintiff may object to this Report and Recommendation and Order by filing with the Clerk of Court no later than **May 13, 2024**, a pleading specifically identifying those portions of the Report and Recommendation and Order to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

---

[41] See Fed. R. Civ. P. 72(b); D.N.D. Civ. L.R. 72.1.